UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| DAVID SCHOTTENSTEIN, ) | |
| KRIS BORTNOVSKY, ) | |
| RYAN SHAPIRO, ) | JURY TRIAL DEMANDED |
| SAKAL CAPITAL MANAGEMENT, LLC, and ) | |
| SAKAL U.S. FUND, LLC, ) | |
| ) | |
| ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following

against Defendants David Schottenstein ("Schottenstein"), Kris Bortnovsky ("Bortnovsky"), Ryan

Shapiro ("Shapiro"), Sakal Capital Management, LLC ("Sakal Capital"), and Sakal U.S. Fund, LLC

("Sakal Fund"):

## SUMMARY

1.      This matter involves a serial insider-trading scheme in which Schottenstein traded on

material, nonpublic information (referred to herein as "inside information") he received from his

"insider" cousin and tipped his friends, Bortnovsky and Shapiro, who also traded.  The scheme

repeated itself ahead of at least three corporate announcements: (a) an August 2017 DSW Inc.

("DSW") earnings announcement; (b) a February 2018 announcement of a merger agreement

between Rite Aid Corporation ("Rite Aid") and Albertsons Companies, Inc. ("Albertsons"); and (c)

a December 2018 announcement of an acquisition of Aphria Inc. ("Aphria") by Green Growth Brands Inc. ("GGB").

2.      Schottenstein traded in advance of all three announcements for total profits of more than $600,000.  Bortnovsky, who managed his own personal brokerage accounts and the accounts of his investment management firm, Sakal Capital, and one of its hedge funds, Sakal Fund, engaged in illegal trading for himself and the Sakal entities.  Bortnovsky made approximately $260,000 in his personal account by trading ahead of the DSW and Rite Aid announcements and approximately $293,000 in the account of another individual by trading in advance of the DSW announcement.  He also traded ahead of all three announcements in the Sakal Fund accounts he controlled and one of the announcements in the Sakal Capital account he controlled, for profits of more than $3.4 million.  Shapiro profited approximately $121,000 by trading on Schottenstein's tips about Rite Aid and Aphria.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

3.      The Commission brings this action pursuant to the authority conferred upon it by Sections 21(d), 21(e), and 21A of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78u-1].  The Commission seeks a permanent injunction against each of the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and civil penalties against each of the Defendants pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] and the Insider Trading and Securities Fraud Enforcement Act of 1988.  In addition, the Commission seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

4.    The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

5.    Venue lies in this Court pursuant to Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa] and 28 U.S.C. § 1391. The brokerage firm ("Broker 1") at which Schottenstein's accounts were held and through which he engaged in insider trading is based in Boston, Massachusetts.

6.    Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein.

## DEFENDANTS

7.    **David Schottenstein**, age 38, is a resident of Surfside, Florida.  He founded a designer sunglasses business in 2016.  He was an investor in Bortnovsky's Sakal Fund and Sakal Capital and also an investor in one of Shapiro's companies.  Schottenstein's cousin ("Insider 1") has served on the DSW board of directors ("board") since 2012 and was also on the GGB board between February and November 9, 2018 and thereafter attended board meetings as a board observer.  Schottenstein's uncle ("Insider 2"), who is the father of Insider 1, has been the Executive Chairman of DSW since March 2005, and he has served on the Albertsons board since 2006.  Schottenstein placed his trades in DSW and some of his trades in Rite Aid securities through an investment adviser that maintained a number of brokerage accounts in Schottenstein's name at Broker 1.

8.    **Kris Bortnovsky**, age 40, is also a resident of Surfside, Florida.  Bortnovsky runs Sakal Ventures, LLC, a venture capital firm based in Miami Beach, Florida.  During the relevant period, he was the manager and president of defendant **Sakal Capital**, a privately held asset

management firm incorporated in Delaware. Sakal Capital was the investment manager for defendant **Sakal Fund**, a hedge fund based in Florida. Bortnovsky made all the investment decisions for Sakal Capital and Sakal Fund.

9.      **Ryan Shapiro**, age 44, resides in Bay Harbor Island, Florida. Shapiro is an entrepreneur who founded two privately held companies.

## **RELEVANT ENTITIES**

10.      DSW was an Ohio corporation headquartered in Columbus, Ohio that operated a retail footwear business. DSW's common stock was listed on the New York Stock Exchange ("NYSE") and previously traded under the ticker symbol "DSW." When DSW changed its name to Designer Brands Inc. in March 2019, its ticker symbol changed to "DBI."

11.      Rite Aid Corporation is a Delaware corporation headquartered in Camp Hill, Pennsylvania that operates retail drugstores. Rite Aid's stock is listed on the NYSE under the ticker symbol "RAD."

12.      Albertsons is a Delaware corporation headquartered in Boise, Idaho that operates retail food and drugstore locations across the U.S. Schottenstein's uncle (Insider 2) has been on Albertsons' board since 2006. In February 2018, Rite Aid and Albertsons announced they had entered into a merger agreement. A private family business owned by Insiders 1 and 2 ("Family Company") and with investments in major retail chains across the U.S. was part of an investment consortium involved in the Rite Aid transaction.

13.      GGB is a Canadian company that operated various cannabis related businesses. Between February and November 9, 2018, Insider 1 was a board member of GGB. On or about November 9, 2018, Insider 1's role changed to that of an observer of GGB's board, entitling him to attend board meetings and interact with GGB management and board members. At one point,

companies controlled by Insider 1 and Insider 2 and other members of their family were collectively the largest shareholders of GGB.

14.    Aphria was a cannabis company headquartered in Ontario, Canada.  Before being acquired by a third party, Aphria's shares traded on the NYSE under the ticker symbol "APHA."  In December 2018, GGB made an offer to acquire Aphria (which subsequently fell through.)

## STATEMENT OF FACTS

### A.  Schottenstein's Close Relationship with Insider 1, Bortnovsky and Shapiro

15.    Schottenstein and Insider 1 are cousins and close friends.  During the relevant period, they frequently visited each other's homes, travelled together, spent holidays together, and communicated very frequently via telephone and text message.  During their many interactions, they had a history, pattern, and practice of sharing confidences, such as confidential business activities that implicated the Family Company.

16.    Schottenstein is close friends with both Bortnovsky and Shapiro.  During the relevant period, Schottenstein frequently communicated with Bortnovsky and Shapiro via telephone and text message and also met at their respective offices and/or homes to discuss, among other things, business dealings and investments.

### B.  Trading Ahead of the DSW Announcement

17.    Insider 1 and Insider 2 have been members of the board of DSW since 2012 and 2005, respectively.  As members of the DSW board, Insider 1 and Insider 2 had access to and regularly obtained material nonpublic information about DSW, including quarterly earnings information, ahead of its release to the public.

18.    As a member of DSW's board, Insider 1 owed DSW a fiduciary duty to keep confidential the financial information he obtained during the course of his service on the board.

19.     On August 22, 2017, DSW released a positive quarterly earnings announcement, sending DSW's stock price up approximately 17%.

20.     In or about mid-August 2017, ahead of DSW's public announcement of its earnings, Schottenstein solicited from Insider 1 that DSW was doing well financially, and Schottenstein traded on that information.

21.     Schottenstein also tipped Bortnovsky that DSW would be issuing a positive earnings announcement, and even asked Bortnovsky's advice on what type of DSW securities to purchase based on such information.  Schottenstein told Bortnovsky that the information had come from Insider 1.  Bortnovsky traded on the inside information in his personal account and in accounts that he controlled in the names of Sakal Capital and Sakal Fund.

22.     The transmission of inside information from Insider 1, to Schottenstein, and then to Bortnovsky and the resulting trades occurred as follows:

23.     On or about August 13 and 14, 2017, Schottenstein and Insider 1 exchanged at least five telephone calls.  The next morning, August 15, 2017, at approximately 7:57 a.m., Bortnovsky and Schottenstein spoke by telephone.  After the call ended, Schottenstein telephoned his investment adviser several times.

24.     At approximately 10:40 a.m. on August 15, Schottenstein received another telephone call from Insider 1, and approximately three minutes later, Schottenstein had several more telephone calls with his investment adviser.  Within minutes, the investment adviser, acting at Schottenstein's direction, began placing orders to purchase DSW call options[1] and shares of DSW stock in

_____

[1] A call option is a type of security that gives the buyer the right to purchase an agreed quantity of an underlying asset at the predefined price (the so called "strike price") within a fixed period of time until its expiration date.  Typically, buying a call option suggests a belief that the price of the underlying asset will increase in value within the fixed period.  There are different series of options available to purchase, each of which has a different strike price and expiration date.

Schottenstein's brokerage accounts held at Broker 1.  All told that day, Schottenstein purchased 17,363 shares of DSW stock and 794 DSW September 2017 call options.

25.    At approximately 11:33 a.m., Schottenstein called Bortnovsky again.  Approximately two minutes after the call ended, Bortnovsky arranged for Sakal Fund to buy approximately 35,000 shares of DSW stock.

26.    Between August 16, 2017 and the morning of August 18, 2017, Schottenstein and Insider 1 and Schottenstein and Bortnovsky exchanged additional telephone calls.  On August 18, Schottenstein also exchanged more than 21 calls with his investment adviser, who, at Schottenstein's direction, then bought 48,760 shares of DSW stock, 1,360 DSW September 2017 call options, and 163 DSW October 2017 call options in Schottenstein's brokerage accounts at Broker 1.

27.    On the same day, August 18, between approximately 10:16 a.m. and 2:37 p.m., Bortnovsky purchased 127,000 shares of DSW stock on behalf of Sakal Fund for approximately $2 million.  During that same four-hour interval, Bortnovsky and Schottenstein called and texted each other about which series of DSW call options to buy.  Schottenstein and Insider 1 also spoke on the telephone during this time period.

28.    On August 20, 2017, Insider 1 called Schottenstein again.  The next day, August 21, Bortnovsky purchased an additional 2,000 shares of DSW stock on behalf of Sakal Fund and 1,600 DSW September 2017 call options and 1,000 DSW October 2017 call options on behalf of Sakal Capital.  The same day, Bortnovsky also purchased 76,500 shares of DSW stock in his personal brokerage account (using $900,000 in borrowed funds to make the purchase) and 89,594 shares of DSW stock in the brokerage account of another individual ("Individual 1") over which Bortnovsky had trading authority and on which he would receive 12.5% of any trading profits generated based on an agreement between Bortnovsky and Individual 1.

29.     At approximately 7:00 a.m. the following day, August 22, 2017, DSW announced positive quarterly financial results that exceeded analysts' expectations.  On the news, DSW's stock price closed at $18.43—a 17% increase over the prior day's close of $15.69.

30.     After DSW's positive earnings announcement, between August 22 and 23, 2017, Bortnovsky sold the entire DSW position in the Sakal Capital account, the Sakal Fund account, and his personal account for profits of approximately $566,000, $465,000, and $256,000, respectively. Bortnovsky also sold the shares he had purchased in the account of Individual 1 for a profit of approximately $293,000.

31.     Between August 22 and August 25, 2017, Schottenstein similarly liquidated his entire DSW position for a total profit of approximately $506,000.

32.     The table below summarizes the relevant trades by Schottenstein, Bortnovsky's Sakal Capital and Sakal Fund, and Bortnovsky personally:

| Trader | Purchases | Sales and Approx. Profits |
|---|---|---|
| Schottenstein | 8/15/2017 - 8/18/2017: <br> (1) 66,123 DSW shares <br> (2) 2,154 DSW September 2017 call options <br> (3) 163 DSW October 2017 call options | 8/22/2017-8/25/2017: <br> All DSW holdings <br> **$506,000** |
| Sakal Fund | 8/15/2017 - 8/21/2017: <br> 164,000 DSW shares | 8/22/2017- 8/23/2017: <br> All DSW holdings <br> **$465,000** |
| Sakal Capital | 8/21/2017 <br> (1) 1,600 DSW September 2017 call options <br> (2) 1,000 DSW October 2017 call options | 8/22/2017: <br> All DSW holdings <br> **$566,000** |
| Bortnovsky | 8/21/2017: <br> 76,500 DSW shares | 8/22/2017: <br> All DSW holdings <br> **$256,000** |
| Individual 1 (account controlled by Bortnovsky) | 8/21/2017: <br> 89,594 DSW shares | 8/22/2017- 8/23/2017: <br> All DSW holdings <br> **$293,000** |

33.     During a February 2018 text message conversation, Bortnovsky and Schottenstein recounted their insider trading in DSW, described above:

Bortnovsky: DSW was a good one

Schottenstein: u never LOST due to my tips…EVER…not once.

**C.  Trading Ahead of the Rite Aid Announcement**

34.     Prior to the market opening on February 20, 2018, Albertsons and Rite Aid announced the companies had signed a definitive merger agreement.

35.     Both Insider 1 and Insider 2 had knowledge of the proposed merger before its public announcement because the Family Company was part of the investment consortium involved in the Albertsons' side of the merger and because Insider 2 had been a member of the Albertsons board since 2006.  By virtue of their respective roles, Insider 1 and Insider 2 had a duty to keep information about the merger confidential.  Further, Insider 1 owed a duty of trust and confidence to his father, Insider 2.

36.     Long before the public announcement on February 20, 2018, Schottenstein learned from Insider 1 that Albertsons planned to acquire Rite Aid and when such a deal was likely to occur. Schottenstein understood that Insider 1 had learned such information from his involvement with the Family Company and from his father, Insider 2.  Schottenstein then used that inside information to purchase Rite Aid securities.

37.     Schottenstein also tipped Bortnovsky and Shapiro about the proposed acquisition during telephone calls, text messages, and in person meetings with each of them.  Schottenstein told Bortnovsky and Shapiro that he had obtained the inside information from Insider 1.

38.     The flow of inside information from Insider 1, to Schottenstein, and eventually to Bortnovsky and Shapiro happened between August 2017 and February 2018 as follows:

39.     Albertsons first began considering a transaction with Rite Aid in mid-July 2017. By August 31, 2017, Albertsons' Chairman had called Rite Aid to schedule a meeting regarding a potential merger.

40.     Throughout August and September 2017, Schottenstein and Insider 1 spoke multiple times (in person and on the telephone). On August 31, 2017, Schottenstein began amassing a position in Rite Aid securities, purchasing 99,000 shares of Rite Aid stock in accounts he controlled at Broker 1 and 720 Rite Aid January 2018 call options.

41.     On September 17, 2017, Insider 1 called Schottenstein at approximately 10:25 a.m. Prior to the opening of the stock market the next day, September 18, Schottenstein made several calls to Insider 1 and then purchased 91,500 shares of Rite Aid stock in his account at Broker 1 and 12 Rite Aid January 2018 call options. That same day, Albertsons and Rite Aid executed a confidentiality agreement.

42.     On September 18, 2017, Schottenstein sent the following message to Shapiro, "U gonna buy any Rite Aid?" Shapiro responded: "Watching." The next day, September 19, Shapiro asked Schottenstein to keep him updated on Rite Aid.

43.     Between September 2017 and January 2018, Schottenstein and Bortnovsky (on behalf of himself and Sakal Fund) traded in and out of Rite Aid securities based on inside information. As of January 20, 2018, Bortnovsky personally held 600,000 shares of Rite Aid stock, Sakal Fund held 1,150,000 shares of Rite Aid stock, and Schottenstein held 132,300 shares of Rite Aid stock.

44.     Then, Schottenstein and Insider 1 vacationed together from at least January 22 to January 24, 2018.

45.     Schottenstein subsequently sold some of his Rite Aid shares and as of January 29, 2018, held 7,600 shares of Rite Aid stock. Thereafter, in late January and early February,

Schottenstein and Bortnovsky made a number of large purchases of Rite Aid stock. For example, on January 30, 2018, Schottenstein purchased 124,700 shares, bringing his Rite Aid holdings back up to 132,300 shares. That morning, Schottenstein and Bortnovsky also messaged about the stock price of Rite Aid being down. Schottenstein advised that this circumstance presented a buying opportunity because Rite Aid stock was "gonna be back to 2.30+ soon."

46.     Bortnovsky arranged for Sakal Fund to purchase 250,000 shares of Rite Aid stock between January 24, 2018 and February 5, 2018, bringing its Rite Aid holdings to 1,400,000 shares as of February 5. Bortnovsky also purchased 100,000 shares of Rite Aid stock in his personal account on January 26, 2018, another 75,000 shares on January 30, 2018, and then 75,000 shares on January 31, 2018, bringing his personal Rite Aid holdings to 850,000 shares as of January 31.

47.     On February 12, 2018, Sakal Fund sold 150,000 shares of Rite Aid stock. Later that day, Schottenstein and Insider 1 met at Insider 1's home. That night, Insider 1 called his father, Insider 2. Then, at 10:28 pm, Insider 1 called Schottenstein. The following day, February 13, Schottenstein messaged Bortnovsky, saying "was calling to tell you something valuable..."

48.     On February 14, 2018, Schottenstein and Bortnovsky spoke by telephone and messaged about Sakal Fund's returns that month and Schottenstein's need to make money from his investment in Sakal Fund. Specifically, Bortnovsky messaged Schottenstein, "If rad [Rite Aid] wakes up this month we'll crush it [three praying emojis]", and Schottenstein responded, "Then we should be crushing it [smiling face emoji]." That day, Bortnovsky, despite having sold 150,000 shares two days earlier, purchased 250,000 shares of Rite Aid stock on behalf of Sakal Fund, bringing Sakal Fund's Rite Aid stock holdings to 1,500,000 shares.

49.     Also that morning, February 14, Schottenstein messaged Shapiro saying, "Also gotta tell u something in person today/tomorrow" and told Shapiro to call him, which Shapiro did. Later

that day, in the course of discussing stock tips, Schottenstein messaged Shapiro, "I have a good idea for u but I like explaining these things in person." The following evening, February 15, 2018, Shapiro messaged Schottenstein, saying "Waiting for the tip," and Schottenstein responded, "In person…I told u man….I had 2 tips….1 of them passed [weary face emoji]…But the other relevant." They then arranged to meet the following afternoon, February 16. Schottenstein messaged Shapiro that the meeting had to take place with "enough time pre market closing."

50.    On February 16, 2018, Shapiro purchased 94,339 shares of Rite Aid stock and messaged Schottenstein to let him know the price he had paid for the stock.

51.    On February 18, 2018, two days before the Rite Aid announcement, Schottenstein sent Bortnovsky a picture of a Rite Aid Pharmacy sign and the message "Talk to u Tuesday" (the planned day for the Rite Aid announcement). Bortnovsky responded, "That's a sign [praying emoji]."

52.    The following day, February 19, 2018 — one day prior to the Ride Aid announcement — Schottenstein and Shapiro exchanged messages. During this exchange, Shapiro asked, "Can we discuss tomorrow when you call me to explain how much money I made from my recent [trades]?" Also on February 19, Insider 1 messaged Schottenstein saying, "Big morning tomorrow," and Schottenstein responded with multiple exclamation points.

53.    On Tuesday, February 20, 2018, before the stock market opened, Rite Aid and Albertsons publicly announced Albertsons' planned acquisition of Rite Aid for the first time. Rite Aid's stock price increased more than 20% in pre-market trading and opened at $2.29, an increase of more than 7.5% from the prior day's closing price of $2.13.

54.    On February 20, after the announcement, Schottenstein called Bortnovsky a number of times in succession and followed up with a text message. He also messaged and called Insider 1

and Shapiro about the news.  Schottenstein's messages with Shapiro centered on selling Shapiro's

Rite Aid holdings.  Shortly after exchanging these messages, Shapiro placed an order to sell the

94,339 Rite Aid shares he had acquired just four days earlier, reaping a total profit of approximately

$27,000.

55.    Also on February 20, 2018, Schottenstein sold the 132,300 shares of Rite Aid stock

that he owned, for a total profit of approximately $55,000.

56.    On February 20 and 21, Bortnovsky sold 850,000 shares Rite Aid stock in his own

account and 1,500,000 shares of Rite Aid stock in the Sakal Fund account for profits of

approximately $6,700 and $297,000, respectively.

57.    The table below summarizes the relevant trades by Schottenstein, Bortnovsky's Sakal

Fund, Bortnovsky personally, and Shapiro:

| Trader | Purchases | Sales and Approx. Profits |
|---|---|---|
| Schottenstein | 8/31/2017 and 1/30/2018: 132,300 RAD shares | 2/20/18: 132,300 RAD shares **$55,000** |
| Sakal Fund | Between approx. 10/11/2017 and 2/14/2018: Net position of 1,500,000 million RAD shares | 2/20/18- 2/21/2018: 1,500,000 RAD shares **$297,000** |
| Bortnovsky | Between approx. 12/12/2017 and 1/31/2018: Net position of 850,000 RAD shares | 2/20/18-2/21/2018: 850,000 RAD shares **$6,700** |
| Shapiro | 2/16/2018: 94,339 RAD shares | 2/20/18: 94,339 RAD shares **$27,000** |

58.    A few months after their successful trading in Rite Aid stock, Schottenstein messaged

Shapiro about purchasing stock in another company not connected to Insider 1.  Shapiro responded

that he would not invest in a company "[I] know nothing about unless it's owned by a friend[']s

family.  Good answer huh?"—an acknowledgment of the source of Schottenstein's tips.

**D.  Trading Ahead of the Aphria Announcement**

59.    After the market closed on December 27, 2018, GGB publicly announced its intention to make a hostile bid (in the form of a tender offer)[2] to acquire Aphria at what GGB represented was a premium to Aphria's closing price on the prior trading day.

60.    Insider 1 was a member of the board of GGB from February 14 through November 9, 2018.  After November 9, 2018, he held the role of "board observer" and maintained certain rights that entitled him to attend GGB board meetings.  Further, he was actively involved with GGB's proposed acquisition of Aphria.  In his role as a board observer, he was contractually bound not to disclose to anyone "any confidential or proprietary information" relating to GGB's "business and affairs."

61.    Nevertheless, Insider 1 shared with Schottenstein real-time updates relating to GGB's proposed acquisition of Aphria before the news was announced publicly.  After learning about GGB's acquisition plans, Schottenstein purchased shares of Aphria in brokerage accounts he controlled.

62.    Schottenstein also tipped information about the acquisition to Bortnovsky and Shapiro.  Schottenstein told Bortnovsky and Shapiro that he had received the inside information from Insider 1, who was associated with the company bidding on Aphria.  Indeed, Shapiro during a meeting with Schottenstein aptly likened Schottenstein to a fictional character on a popular television show about insider trading.

---

[2] A "hostile bid" is a specific type of takeover bid that bidders present directly to the target firm's shareholders because the management is not in favor of the deal. Bidders generally present their hostile bids through a tender offer. With a hostile bid, the acquiring company generally offers to purchase the common shares of the target at a premium to the target's then-current stock price.

63.     Schottenstein received inside information about the Aphria tender offer from Insider 1 and tipped Bortnovsky and Shapiro as follows:

64.     On or about December 5, 2018, GGB executives had a call with investment bankers to discuss a possible acquisition of Aphria in the wake of a precipitous decline in Aphria's stock price.  That same day, Insider 1 called his father, Insider 2, and exchanged multiple calls with another major shareholder and former board member of GGB.  While Insider 1 was on the telephone with the former GGB board member, Insider 1 and Schottenstein had the following text message conversation:

11:58:44 a.m. Schottenstein: This aphria thing isn't stopping

11:58:46 a.m. Schottenstein: Crazy

11:58:50 a.m. Schottenstein: Tanking

11:59:00 a.m. Insider 1: I have even more crazy for u

11:59:04 a.m. Schottenstein: What??

11:59:24 a.m. Schottenstein: ??

Schottenstein then called Insider 1 twice, and messaged him again telling him to call him back. They connected by telephone approximately two minutes later.  Directly after his call with Insider 1, Schottenstein messaged Shapiro telling him he needed to speak to him immediately.

65.     At approximately 12:54 pm on the same day, December 5, Schottenstein messaged Insider 1 again asking to talk.  After Insider 1 finished a series of calls with GGB and Aphria's officers and directors, Schottenstein and Insider 1 spoke on the telephone.  Schottenstein followed up the telephone call with a congratulatory text message to Insider 1.  Schottenstein then visited Insider 1's home on or about December 11 and December 12, 2018.

66.     Between December 13 and 14, 2018, GGB directed an investment banking firm to prepare a presentation for GGB's management concerning a potential acquisition of Aphria, and GGB formally engaged legal counsel.  On or about December 14, 2018, Schottenstein went to Insider 1's house again.  While at Insider 1's house, Schottenstein contacted a close relative and had him access Schottenstein's brokerage account to buy 35,600 shares of Aphria stock.  Later the same day, Schottenstein purchased an additional 35,000 shares of Aphria stock.

67.     After his visit with Insider 1, Schottenstein reached out to Shapiro and Bortnovsky to talk by telephone or meet.  On December 17, 2018, Schottenstein and Shapiro met for an hour.  Shortly after the meeting, Schottenstein messaged Shapiro that he was "very excited."  Shapiro concurred.

68.     On or about December 18, 2018, the same morning that GGB alerted Aphria that a proposal outlining a potential transaction would be forthcoming, Schottenstein and Shapiro met again.  Around the same time that Schottenstein was at Shapiro's office, Shapiro purchased 87,000 shares of Aphria stock.

69.     Also on December 18, 2018, Schottenstein met with Bortnovsky.  Minutes later, Bortnovsky had Sakal Fund purchase 2,000 Aphria January 2019 call options with a $5.00 strike price and 3,000 Aphria January 2019 call options with a $7.50 strike price.

70.     Between December 18 and 19, 2018, while in Las Vegas, Nevada, Insider 1 had a series of calls with GGB board members, executives, and merger advisors.  On December 19, 2018, Schottenstein joined Insider 1 in Las Vegas.

71.     While en route to Las Vegas, on December 19, Schottenstein messaged Shapiro that he was meeting Insider 1 in Las Vegas and that he wanted to double his Aphria investment.

72.    The following morning, December 20, 2018, before Insider 1 departed to meet with Aphria executives at Aphria's headquarters, Schottenstein wished Insider 1 luck and congratulated him.  Later that day, Schottenstein repeatedly messaged Insider 1 to find out how the meeting had gone.  The two spoke the next morning, December 21, by telephone.

73.    That day, December 21, 2018, Sakal Fund accumulated another 1,500 Aphria January 2019 call options with a $5.00 strike price and 2,000 Aphria January 2019 call options with a $7.50 strike price.  Based on the $4.85 closing price of Aphria's shares that day and the $7.50 strike price of some of the options Bortnovsky purchased in the Sakal Fund account, Aphria's stock price would have had to appreciate more than 40% in a month for it to exceed the options' strike price.

74.    On Sunday, December 23, 2018, Bortnovsky and Schottenstein met at Schottenstein's home.  The next trading day, December 24, Sakal Fund purchased 1,000,000 shares of Aphria stock for approximately $4.9 million.

75.    The morning of December 27, 2018, Schottenstein asked Insider 1 if he could join him at his house and listen in on a GGB presentation to Aphria's board.  Schottenstein went to Insider 1's house that morning, during which time Insider 1 had multiple calls with Insider 2 and a former GGB board member.

76.    At 12:01 p.m. on December 27, 2018, while still at Insider 1's house, Schottenstein messaged Shapiro to tell him to remain reachable.  One minute later, Shapiro called Schottenstein.  After leaving Insider 1's house, Schottenstein called Insider 1.  Schottenstein also messaged Shapiro and instructed Shapiro to call him.  Then, Insider 1 messaged Schottenstein with a news report about a GGB hostile bid to acquire Aphria and the GGB press release about the acquisition that had yet to be released publicly.  Before the release was made public, Schottenstein messaged Shapiro, "Callllll me."

77.    On December 27, 2018, Bortnovsky sold for a profit 200,000 of the 1,000,000 Aphria shares Sakal Fund had purchased on December 24.  The same day he also bought another 5,000 January 2019 call options with a $5.00 strike price.

78.    After the market closed on December 27, 2018, GGB announced its hostile bid to acquire Aphria at what GGB represented was a premium to Aphria's closing price on the prior trading day.

79.    Aphria publicly rejected GGB's bid the following morning, December 28, before markets opened.  Following the public announcement of GGB's hostile bid on December 27 and Aphria's rejection of that bid on December 28, Aphria's share price traded as high as $6.37 per share on December 28, closing at $6.26—an increase of more than 12 percent from the prior day's closing price of $5.57.

80.    That day, December 28, Sakal Fund sold its 5,000 Aphria call options with a $7.50 strike price, 2,000 Aphria call options with a $5.00 strike price, and 75,000 of its Aphria shares, generating a profit of approximately $48,000.  That morning, Bortnovsky acknowledged the source of Schottenstein's tip, messaging Schottenstein, "[What] a crazy situation! I own shares of apha and I see some of your family trying to buy the company **lol**" (emphasis added).

81.    Approximately fifteen minutes after Bortnovsky's message, Schottenstein began probing Insider 1 for information on the bid and learned that there would be no change to GGB's bid for Aphria and that GGB planned to go to the Aphria shareholders with its current tender offer in January 2019.  Minutes after learning this information, Schottenstein messaged Shapiro and Bortnovsky about what to do with their respective Aphria positions, advising both not to sell yet.

82.    Nearly two weeks later, on or about January 10, 2019, Bortnovsky messaged Schottenstein asking if he owned any Aphria securities, to which Schottenstein (falsely) responded,

"I can't."  Later the same day, Schottenstein sold his 70,600 shares of Aphria stock at prices between $6.78 and $6.80 per share for a profit of approximately $74,000.

83.    The same day, January 10, Schottenstein also instructed Shapiro to sell his 87,000 shares of Aphria stock, which Shapiro did for a profit of approximately $94,000.

84.    Between January 10 and January 11, 2019, Sakal Fund sold its remaining Aphria stock and call options, reaping total illicit profits of approximately $2.13 million.

85.    The table below summarizes the relevant trades by Schottenstein, Sakal Fund, and Shapiro:

| Trader | Purchases | Sales and Approx. Profits |
|---|---|---|
| Schottenstein | 12/14/2018:<br>70,600 APHA shares | 1/10/2019:<br>All APHA holdings<br>**$74,000** |
| Shapiro | 12/18/2018:<br>87,000 APHA shares | 1/10/2019:<br>All APHA holdings<br>**$94,000** |
| Sakal Fund | 12/18/2018- 12/27/2018:<br>(1) 8,500 APHA January 2019 $5 call options<br>(2) 5,000 APHA January 2019 $7.50 call options<br><br>12/24/2018:<br>1,000,000 APHA shares | 12/27/2018:<br>200,000 APHA shares<br><br>12/28/2018-1/11/2019:<br>All APHA call options<br>800,000 APHA shares<br>**$2.13 million** |

86.    A few months after their illegal trading in Aphria stock, Shapiro forwarded Schottenstein an e-mail summarizing his gains in a number of securities, including Aphria. Schottenstein responded by requesting that Shapiro donate in Schottenstein's name half of the trading profits to the synagogue they both attended to be able to get a tax deduction.

**E.    The Defendants Traded in Violation of the Law**

87.    Schottenstein knew or recklessly disregarded that the information he received from his relative and close friend, Insider 1, about DSW, Rite Aid and Aphria was material and nonpublic. When he traded on the basis of the inside information, Schottenstein knew, should have known, consciously avoided knowing, or was reckless in not knowing that he did so in breach of a duty.

88.     Schottenstein also knew, should have known, consciously avoided knowing, or was reckless in not knowing that he breached a duty to the source of the inside information when he tipped Bortnovsky and Shapiro.  He received a personal benefit for the tips, including, but not limited to, providing a gift of confidential information to his close friends, Bortnovsky and Shapiro, and/or actual or anticipated pecuniary benefits.

89.      For example, Schottenstein and Shapiro agreed that some of the profits that Shapiro generated from the insider trading tips Schottenstein provided would go to their mutual synagogue for Schottenstein's benefit.  Further, Schottenstein is an investor in one of Shapiro's companies.  In exchange for the opportunity to make money by investing in Shapiro's company, Schottenstein promised Shapiro that Schottenstein would help Shapiro make money trading stocks.

90.     Schottenstein also benefitted from his tips to Bortnovsky because he was a substantial investor in Bortnovsky's investment management firm Sakal Capital and one of its hedge funds, Sakal Fund, both of which reaped substantial profits by trading on Schottenstein's tips.

91.     Bortnovsky and Shapiro knew or recklessly disregarded that the earnings and acquisition information Schottenstein provided them was material and nonpublic.  They also knew, should have known, consciously avoided knowing or recklessly disregarded that the inside information was provided to them in breach of a duty.

## **FIRST CLAIM**

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
(All Defendants)

92.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 91 above.

93.     At the time the Defendants traded in the securities set forth above, they were in possession of material, nonpublic information about the issuers.  The Defendants (a) knew, or were reckless in not knowing, should have known, or consciously avoided knowing that the information was disclosed to them in breach of a duty and that the tipper received a personal benefit; and (b) while in knowing possession or while recklessly not knowing they were in possession of material nonpublic information, used the information by trading for their benefit.

94.     By engaging in the conduct described above, the Defendants, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any  national securities exchange, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon persons.

95.     The Defendants acted with scienter.  Bortnovsky's scienter is imputed to Sakal Fund and Sakal Capital by virtue of his control over them.

96.     By engaging in the conduct described above, the Defendants, directly or indirectly, violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## SECOND CLAIM

### Violation of Section 14(e) of the Exchange Act and Rule 14e-3 thereunder
(Schottenstein, Bortnovsky, Shapiro, and Sakal Fund)

97.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 9, 13 through 16, and 59 through 91 above.

98.     By engaging in the conduct described above, Defendants Schottenstein, Bortnovsky, Shapiro, and Sakal Fund, purchased or sold or caused to be purchased or sold Aphria securities while in possession of material information relating to a tender offer for Aphria.

99.     Defendants knew, consciously avoided knowing, or were reckless in not knowing that this information was nonpublic, and that they had acquired it, directly or indirectly, from the offering person, the issuer of the securities sought or to be sought by such tender offer, and/or any officer, director partner, employee, or other person acting on behalf of either the offering person or the issuer.

100.     Defendants purchased or sold or caused to be purchased or sold securities of Aphria, the issuer of the securities sought or to be sought in a tender offer.  Defendants traded Aphria securities after a substantial step or steps had been taken to commence a tender offer for the shares of Aphria and before the tender offer had been publicly disclosed.

101.     By engaging in the conduct described above, Defendants Schottenstein, Bortnovsky, Shapiro, and Sakal Fund, and each of them, directly or indirectly, violated Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3], and unless restrained and enjoined will continue to violate them.

## **RELIEF REQUESTED**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

A.     Permanently restraining and enjoining the Defendants from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder and Schottenstein, Bortnovsky, Shapiro, and Sakal Fund from violating Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [[17 C.F.R. § 240.14e-3];

B.      Ordering the Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] and the Insider Trading and Securities Fraud Enforcement Act of 1988;

C.      Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

D.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

/s/  Susan Cooke Anderson
Susan Cooke Anderson (D.C. Bar No. 978173)
    Trial Counsel
Eric A. Forni (Mass. Bar No. 669685)
    Trial Counsel
Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street
Boston, MA  02110
(617) 573-4538 (Anderson direct)
andersonsu@sec.gov

Dated:  January 6, 2022